**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
**ARLENE G. HOWE-ANDREWS,**

             **Plaintiff,**

          **OPINION AND ORDER**
  -against-                                  **CV-05-4539 (NG)**

**MICHAEL J. ASTRUE, Commissioner of**
**Social Security,**

             **Defendant.**
-----------------------------------------------------------x

**GERSHON, United States District Judge:**

      Plaintiff Arlene G. Howe-Andrews brings this action pursuant to Section 405(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), to review the final decision of the Commissioner of Social Security denying her application for disability insurance benefits ("DIB"). Defendant moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Plaintiff opposes the defendant's motion and requests a reversal of the denial of benefits.

**I. BACKGROUND**

**A. Procedural History**

      Plaintiff filed an application for DIB on June 4, 2003. This application was denied by the Commissioner, after which plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). On December 8, 2004, the ALJ, Marilyn P. Hoppenfeld, denied plaintiff's application for disability benefits, holding that plaintiff was not disabled within meaning of the Act on or before December 31, 1992, the date she was last insured for DIB.

1

Plaintiff then requested review of the ALJ's decision, which was granted by the Appeals Council on May 5, 2005. In the notice granting the request, the Appeals Council stated that it was prepared to vacate and modify the ALJ's decision regarding plaintiff's residual functional capacity, but to nonetheless adopt the ALJ's findings that the plaintiff retained the ability to perform her past work as a bookkeeper and therefore was not disabled. The Appeals Council also offered the plaintiff the opportunity to put forth new evidence that was pertinent to her claim of disability and make a request for a personal appearance.

In response, plaintiff submitted an affidavit to the Appeals Council. After considering the new evidence, the Appeals Council issued a decision on July 20, 2005, concluding that plaintiff was not disabled. Plaintiff then filed this civil action.

**B. Plaintiff's Personal/Work History**

Plaintiff was born on January 23, 1945. At the time her insurance status expired on December 31, 1992, she was forty-seven years of age. In 1966, plaintiff graduated from high school and began work as a filing clerk. Until March 1988, plaintiff worked consistently for various companies as a filing clerk, bookkeeper, and payroll supervisor, stopping work for a year in 1979 to care for her infant daughter.

In March 1988, plaintiff left her job as payroll supervisor at Goff Security to undergo surgery for endometrial cancer. At the time, her job required her to supervise two employees for approximately four hours a day. Plaintiff was required to sit for the entire eight hour day, stand for fifteen minutes, and frequently handle payroll books that weighed no more than ten pounds. She worked only three days a week and occasionally worked from home.

Plaintiff maintains that her job at Goff Security was really sheltered employment because her boss made certain accommodations for her ailments. At work, plaintiff sat in her boss's large chair because it was the only one that could accommodate her weight. At her ALJ hearing, plaintiff, who is approximately 5'3" tall, testified that, since she developed a thyroid condition in 1966, she has always weighed between about 350 and 400 pounds. In order to accommodate plaintiff's anxiety, other employees brought her lunch, and she occasionally worked from home. Plaintiff testified that she suffers from anxiety, for which she has taken tranquilizers since approximately 1968. Plaintiff stated that she has constant fear and anxiety of going out in public because she is afraid she could trip and fall. Because of this fear, she has not taken public transportation since 1966; she travels only with her husband, who, prior to her surgery, drove her to and from work.

Since her surgery, plaintiff has not been employed. Plaintiff stated in her affidavit that her hospitalization in 1988 put her "over the edge," after which she was unable to perform any of her past work. However, plaintiff testified before the ALJ that she was ready to return to work at Goff Security in September 1988, but did not because the company had closed a month earlier.

In her affidavit, plaintiff claimed that, in 1988, she could not stand for more than five minutes and was barely able to walk a block. She claimed she could not take public transportation because her obesity made her incapable of climbing subway or bus stairs and she feared going out in public alone. In contrast, at the ALJ hearing she stated that, weight-wise, she could have taken public transportation; it was her anxiety that prohibited her from riding the bus.

At her hearing in 2004, plaintiff testified that, in 2004, the longest she could walk was about a half a block, the longest she could stand was five minutes, and the longest she could sit was thirty minutes. Despite these limitations, plaintiff could still do some household chores and other tasks.

3

Specifically, plaintiff cooked while sitting down on a daily basis, including using an electric skillet and preparing vegetables, meat, and sandwiches. She cleaned the house "as best [she] could," although sometimes someone had to help her with the vacuum cleaner. Her cleaning chores included washing laundry, dusting, and ironing while seated. She also made her bed, fed her dog, and showered without assistance. Although plaintiff said at her 2004 hearing that her husband did all the shopping, in her 2003 disability application she claimed she shopped, with her husband, once a week for one to two hours for clothes, food, and decorations.

In addition to these chores, plaintiff also claimed that she sewed and watched television at home. Socially, she talked on the telephone with friends weekly and visited friends on the holidays. Plaintiff also went out once a week with her husband.

**C. Plaintiff's medical history**

**1. Medical History Prior to the date plaintiff was last insured, December 31, 1992**

Prior to the March 1988 surgery, plaintiff's only treating physician was Dr. David Herkus. However, there are no records from Dr. Herkus because he retired and then passed away, and subsequently his records were lost.

In her testimony before the ALJ, plaintiff claimed that she has suffered from hypertension since the age of eighteen. At a pre-operative medical consultation at Memorial Sloan-Kettering Cancer Center in March 1988, plaintiff was described as having a long history of hypertension, for which she took Tenormin and Dyazide.

Plaintiff also claimed that she suffered from panic attacks and was in a constant state of stress and anxiety because of multiple deaths in her family. To combat this, plaintiff testified that

4

she had taken tranquilizers since approximately 1968, although the Sloan-Kettering report indicated that plaintiff was on minor tranquilizers since 1977 and Ativan since 1983. Plaintiff has never consulted a psychotherapist.

Plaintiff also testified that she developed a thyroid condition soon after her marriage in 1966. According to plaintiff, her general physician diagnosed her thyroid condition; however, he would never treat her: "[o]nce in a blue moon he would give me medicine." R. at 213.[1] Mostly, Dr. Herkus told her to lose weight.

On March 25, 1988, plaintiff was diagnosed with grade I endometrial adenocarcinoma by doctors at Sloan-Kettering. At a pre-operative medical consultation, plaintiff was described as morbidly obese with a long history of hypertension and anxiety, for which she had been taking medication. The pre-operative report also indicated that plaintiff suffered from minor shortness of breath after walking the one and a half flights of stairs to her apartment.

Physical examination of the plaintiff revealed that her blood pressure was 180/100 when taken with a large arm cuff, and 140/70 with a thigh cuff. The presiding physician described the plaintiff as massively obese and as having mild respiratory distress after walking and talking a lot. In addition, plaintiff had mild to moderate tenderness over the L4 veterbrae, somewhat distant heart sounds, I/VI early systolic murmurs, and moderate varicosities of the extremities, but no edema. She was very anxious, but her affect and speech were normal. The overall impression of the examiner, Dr. Nelson, was that (1) surgery was the best and only option for plaintiff's endometrial cancer; (2) her hypertension was in fairly good control; (3) she was morbidly obese; and (4) her Chronic Anxiety Disorder was fairly controlled on Ativan, but she could benefit from psychotherapy.

---

[1]Citations to the administrative record are designated as "R."

On April 10, 1988, plaintiff was admitted to Sloan-Kettering for surgery. Upon physical examination, plaintiff's blood pressure was 130/90, and she was described as morbidly obese with a weight over 160 kilograms and trace edema of the calf. The impression was stage I grade I adenocarcinoma of the endometrium; hypertension; obesity; history of polycystic ovarian disease; elevated uric acid; and questionable hypothyroid function. On April 11, plaintiff was evaluated by the psychiatric division because of her history of panic attacks. The evaluating physician determined that she would be referred to psychotherapy and tricyclic medication following surgery.

On April 12, 1988, plaintiff underwent surgery in which the tumor, along with her uterus and ovaries, were removed. According to pathology reports, the tumor had not invaded additional areas. On April 25, plaintiff was discharged. At discharge plaintiff could stand, walk, climb stairs, cook, and eat independently, although she needed assistance shopping. Following surgery plaintiff underwent three intervaginal radiation treatments on June 15, June 29, and July 12, all of which she tolerated well. There was no mention in the record of recurrence of the cancer, and plaintiff does not claim that her cancer was a contributing illness, injury or condition that limited her ability to work.

Besides the treatment she received at Sloan-Kettering there is no other medical evidence available prior to December 31, 1992. Plaintiff claimed to have received "mental medical treatment" from Dr. Herkus from 1988 to 1992; however, as noted above, Dr. Herkus' records are not available. Plaintiff did not claim she received any other medical treatment during this time.

**3. Medical History after December 31, 1992**

After 1992 plaintiff did not receive medical treatment from Dr. Herkus. At oral argument plaintiff's counsel agreed that, from that time to 1995, plaintiff received no medical treatment at all.

Beginning in 1995, plaintiff visited as her primary care physician Dr. Alfred DeRosa, who saw her every one to two weeks.[2] In 1995, plaintiff was diagnosed with arthritis, for which she began using a cane in 2003. In 2003, Dr. DeRosa completed a questionnaire describing his treatment of the plaintiff. Based on her condition on the date of her most recent prior visit, June 15, 2003, plaintiff's height was 5'2", her weight was 380 pounds, and her blood pressure was 160/90. Dr. DeRosa's treating diagnoses were high blood pressure, cellulitis, diabetes mellitus, and colitis. Plaintiff's symptoms were diarrhea, back pain, frequent urination, and high blood pressure. At the time, plaintiff's medications were Norvasc, Synthroid, Glucovance, Librax, Azulfidine, Allegra, and Cipro. Dr. DeRosa's clinical finding was decreased motion from plaintiff's weight. In addition the doctor found plaintiff suffered from fatigue. He opined that plaintiff could stand for less than two hours per day, could sit for less than six hours a day, could neither lift anything nor push and/or pull, and therefore was unable to work.

## II. ALJ DECISION

The issue before the ALJ was whether plaintiff was disabled within the meaning of the Act. In determining that she was not, the ALJ followed the proscribed five-step analysis. *See* 20 C.F.R. § 404.1520 (2006). First, the ALJ concluded that there was no proof that plaintiff engaged in substantial gainful activity for the period in question, January 1, 1987 to December 31, 1992.

Next, the ALJ consulted both the claimant's testimony and the medical evidence and concluded that plaintiff's morbid obesity, high blood pressure, cellulitis, diabetes, and colitis in

---

[2]Plaintiff reported that she was treated for cellulitis at Bon Secours Hospital in 1996 for two weeks; however, the hospital no longer has any relevant records.

7

combination with the surgery performed for grade I, stage I adenocarcinoma of the endometrium were impairments that were severe within the meaning of the Regulations. However, the ALJ concluded that the impairments were "not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." R. at 39. Specifically, the ALJ found that "there is no indication of recurrence of carcinoma and although the claimant had complaints, there is no evidence of complications or end organ damage secondary to high blood pressure or diabetes." *Id*. The ALJ noted that the only clinical finding in the record was decreased motion, and that plaintiff was "noted to be depressed but positive mental status findings were not reported." *Id*. As a result, the ALJ held that, "based on the evidence of record, the claimant did not have impairments, singly or in combination, that met or equaled the requirements of a listed impairment on or before December 31, 1992." *Id*.

However, because plaintiff's impairments were severe, the ALJ then considered whether the plaintiff retained "the residual functional capacity to perform the requirements of her past relevant work or other work existing in significant numbers in the national economy." *Id*. In making this assessment, the ALJ noted that, in 1988, her hypertension and anxiety were under good control and that, upon discharge from the hospital in April 1988, plaintiff could walk, stand, climb stairs, and cook independently. Furthermore, the ALJ found "[t]here is no indication that after 1988, she required any further treatment for carcinoma," and "[t]here is no proof of any treatment from 1988 to 1995." R. at 40. The ALJ also noted that, in 2004, plaintiff "cooks, makes the bed, dusts, cleans, does laundry, irons... goes out once a week with her husband, sews, watches television, and has visitors." *Id*.

The ALJ considered plaintiff's allegations of limitations; however, she concluded that they

8

were "not supported by clinical and laboratory findings, and were not consistent with her activities on or before December 31, 1992, the lack of medical treatment until 1995 and were not accepted." *Id*. The ALJ also considered plaintiff's morbid obesity, but found "no medical evidence that her obesity was limiting during the period in question since she worked with the same weight prior to 1987." *Id*. Finally, the ALJ looked at Dr. DeRosa's assessments but found they were "not supported by the physician's only clinical finding or the findings from Memorial Hospital, the only medical evidence available prior to December 31, 1992." *Id*. The ALJ also noted that Dr. DeRosa did not see the plaintiff until 1995, well after the date she was last insured.

As a result, the ALJ concluded that, "on or before December 31, 1992, the claimant retained the residual functional capacity to stand and/or walk six hours in an eight-hour day, sit six hours in an eight hour day, occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, occasionally bend, push and/or pull twenty pounds, and to function mentally." *Id*. Based on the fact that plaintiff's past relevant work as a bookkeeper consisted of sitting for eight hours, standing for fifteen minutes, and carrying no more than ten pounds, the ALJ found that the plaintiff retained the ability to perform her past relevant work on or before December 31, 1992. Consequently, the ALJ held that plaintiff was not "under a disability as defined in the Social Security Act on or before December 31, 1992." R. at 41.

### III. APPEALS COUNCIL DECISION

On review the Appeals Council evaluated the ALJ's findings using the same sequential evaluation process. The Appeals Council agreed with the ALJ's findings that "the claimant has not engaged in substantial gainful activity since January 1, 1987, that the claimant has severe

9

impairments which do not meet or equal in severity an impairment in the Listing of Impairments and that the claimant is capable of performing past relevant work." R. at 7.

However, the Appeals Council disagreed with the ALJ's determination that plaintiff retained the residual functional capacity to stand and/or walk six hours in an eight hour day. In considering plaintiff's obesity in conjunction with her other impairments, the Appeals Council concluded that plaintiff retained the residual functional capacity to stand and/or walk no more than two hours in an eight hour day. However, because the Council concluded that plaintiff could still sit for up to six hours, occasionally carry and/or lift twenty pounds, and frequently carry and/or lift ten pounds, it concluded that she was able to return to her past work as a bookkeeper prior to December 31, 1992.

The Appeals Council considered plaintiff's affidavit which stated that her employment was really sheltered employment, that she was unable to stand or walk for even 2 hours in an eight hour day, and that she was unable to take public transportation because of her anxiety and obesity. The Appeals Council found that plaintiff's employment was not sheltered since the wages she earned as a bookkeeper were above the amounts usually considered substantial gainful employment. The Appeals Council also concluded that there was not enough medical evidence during the relevant period to support plaintiff's additional claims. Treatment notes of March 1988 indicated that plaintiff could walk one and a half flights of stairs and that her hypertension and anxiety were under control. Furthermore, plaintiff had never been to a psychotherapist and there were no medical findings to support a medically determinable mental impairment. Finally, there was no further documentation of either mental or physical treatment from 1988 to 1995.

## IV. DISCUSSION

The court may set aside the Commissioner's decision only if it is based on legal error or if the factual findings are not supported by substantial evidence. *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997). The Supreme Court has defined the term "substantial evidence" in the social security context as being "more than a mere scintilla" and as that evidence which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). If substantial evidence exists in support of the Commissioner's decision, the court must uphold the decision. *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996). Furthermore, the Commissioner's findings of fact are conclusive, even if the reviewing court's independent analysis may differ from the Commissioner's analysis. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

The issue presented in this case is whether the Commissioner erred in finding that the plaintiff was not disabled within the meaning of the Social Security Act, 42 U.S.C. § 405(g), at any time between January 1, 1987 and December 31, 1992. In determining whether a person is disabled within the meaning of the Act, the Commissioner has established a five-step sequential process. First, the Commissioner considers whether the plaintiff is currently engaged in substantial gainful activity. If not, the Commissioner next considers whether the claimant has a severe impairment that significantly limits her ability to do basic work activities. If she has such an impairment, the third inquiry is whether the impairment meets or equals a listed impairment. If the claimant does not have a listed impairment, the Commissioner then evaluates whether she can perform her past relevant work or make an adjustment to other work. 20 C.F.R. § 404.1520(a)(4) (2006). Following this five-step inquiry, the Appeals Council concluded that the plaintiff was not disabled because: (1) her

severe impairments did not meet or equal a listed impairment and (2) she could still perform past relevant work.

**A. The Commissioner did not err in finding that plaintiff's impairments did not meet or equal a listed impairment.**

Plaintiff argues that the Commissioner did not properly consider obesity when evaluating whether her impairments met or equaled a listed impairment. Specifically, she claims that the Commissioner should have found an equivalency in considering obesity in combination with (1) her inability to ambulate or (2) her mental impairment.

On October 25, 1999 obesity was removed from the list of impairments in 20 C.F.R. pt. 404, subpt. p, app. 1. However, the Social Security Administration ("SSA") has made changes to the listings to ensure obesity is still addressed in the listings. *See* Social Security Ruling ("SSR") 02-1p: "Titles II and XVI: Evaluation of Obesity," 67 Fed. Reg. 57859 (Sept. 12, 2002). Specifically, in SSR 02-1p the SSA describes how to evaluate obesity at each step of the Sequential Evaluation Process of 20 C.F.R. § 404.1520. With regard to step three, SSR 02-1p states that "obesity may be a factor in both 'meets' and 'equals' determinations." 67 Fed. Reg. at 57862. Thus, obesity is not in and of itself a listed impairment that requires a finding of disability. 67 Fed. Reg. 57859; 20 C.F.R. pt. 404, subpt. p, app. 1 (2006). As stated in *Burger v. Barnhart*, 476 F. Supp. 2d 248, 254 (W.D.N.Y. 2007), "SSR 02-1p requires the ALJ to consider the effects of obesity on an individual's health at all steps in the sequential evaluation process, but does not automatically require an ALJ to find an obese claimant disabled because of his or her obesity."

Here, the Commissioner properly considered plaintiff's obesity. Both the Appeals Council and ALJ found that plaintiff's morbid obesity was a severe impairment, although not severe enough

to meet or equal a listed impairment. The ALJ explicitly stated, "[c]onsideration was given to claimant's morbid obesity," finding no evidence her weight was limiting since she worked with the same weight prior to 1987. R. at 40.

The Commissioner's determination that plaintiff's impairments did not meet or equal a listed impairment was based on substantial evidence. In arguing her obesity was medically equivalent to a listing, plaintiff relies on Paragraph 7 of SSR 02-1p, which states:

> We may also find that obesity, by itself, is medically equivalent to a listed impairment. For example, if the obesity is of such a level that it results in an inability to ambulate effectively, as defined in sections 1.00 B2b or 101.00 B2b of the listings, it may substitute for the major dysfunction of a joint(s) due to any cause (and its associated criteria), with the involvement of one major peripheral weight bearing joint in listings 1.02A or 101.02A, and we will then make a finding of medical equivalence. 67 Fed. Reg. at 57862.

Section 1.00 B2b of the Listings defines effective ambulation:

> b. What We Mean by Inability to Ambulate Effectively
>
> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.
>
> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation. 20 C.F.R. pt. 404, subpt. p, app. 1 § 1.00(B)(2)(b) (2006).

13

Plaintiff claims that the evidence shows she could not ambulate effectively; however, the regulations make clear that a determination of medical equivalence must be "based solely on medical evidence." *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). Here, there is no medical evidence from the relevant period indicating plaintiff could not ambulate effectively. In her pre-operative evaluation at Sloan-Kettering, the treating physician noted that plaintiff could walk one and a half flights of stairs with only mild shortness of breath. Further, in the discharge summary from Sloan-Kettering, plaintiff was described as being able to stand, walk, climb stairs, and cook independently. The medical assessment of Dr. DeRosa was found insufficient by the Commissioner since it was an evaluation of plaintiff in 2003, many years after the relevant period. In any event, Dr. DeRosa did not explicitly discuss the issue of effective ambulation, finding only decreased motion. There is also no medical evidence that plaintiff's obesity inhibited her physical ability to take public transportation.

Plaintiff also argues that her obesity combined with her Chronic Anxiety Disorder meets or equals Listing 12.06 for Anxiety-Related Disorders. For a claimant to show that a combination of impairments is equivalent to a listing, "he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990). But, plaintiff presents no medical evidence that shows her anxiety and her obesity caused her either "marked restrictions of activities of daily living," "marked difficulties in maintaining social functioning," or "complete inability to function independently outside the area of one's home" as required by the listing and as argued by plaintiff. *See* 20 C.F.R. pt. 404, subpt. p, app. 1 § 12.06 (2006). The examiner at Sloan-Kettering noted that plaintiff suffered from Chronic Anxiety Disorder; however, he stated it was under fair control because of Ativan. The psychiatric division

at Sloan-Kettering made no recorded findings as to her anxiety, and, although it recommended psychotherapy, plaintiff has never consulted a psychotherapist. Although plaintiff states she was treated for her mental disorders by her physician from 1988 to 1992, she also acknowledged that she received very limited treatment from him. In addition, there is little medical evidence regarding limitations from plaintiff's obesity. *See* discussion *supra* 14. As a result, plaintiff cannot, by medical evidence, establish that her anxiety and obesity equal a listing under 12.06.

By failing to submit documented medical findings as to her ineffective ambulation and mental disorder, plaintiff failed to meet her burden of establishing that her impairments met or equaled a listed impairment. Moreover, plaintiff worked with reasonable regularity until her surgery in 1988 despite her obesity and mental disorder and was prepared to work in September 1988. Accordingly, it does not appear, from the evidence of record, that her obesity and mental disorder were serious enough to amount to an equivalency under the Listings. As a result, the Commissioner's findings were supported by substantial evidence and therefore are upheld.

**B. The Commissioner did not err in finding that plaintiff could perform past relevant work**.

The next issue is whether the Commissioner's decision that plaintiff had the residual functional capacity to perform her past relevant work[3] was infected by legal error or unsupported by substantial evidence.

Here, the Appeals Council, like the ALJ, concluded that the plaintiff retained the residual

---

[3] Past relevant work is defined either as how the job is performed in the national economy or *as the claimant actually performed it*, presumably including the modest accommodations that plaintiff's boss provided her. *See* 20 C.F.R. § 404.1560(b)(2) (2006) (emphasis added).

functional capacity to perform her past job as a bookkeeper[4]. A determination of residual functional capacity must examine all impairments and must be based on all relevant medical and other evidence in the record. *See* 20 C.F.R. § 404.1520(e); SSR 96-8p: "Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims," 1996 WL 374184, *1 (July 2, 1996). The Commissioner properly considered all impairments, including plaintiff's obesity, and examined all relevant medical records and other evidence, including plaintiff's testimony and affidavit.

The Commissioner's decision that plaintiff could perform her past relevant work as a bookkeeper was supported by substantial evidence. Plaintiff worked until March 1988 even though she was obese and suffered from hypertension and panic attacks. Plaintiff has been the same weight throughout her adult life, has had hypertension since 1968, and has been medicated for her anxiety since at least 1983. Nonetheless, she worked regularly at various jobs from 1966 to March 1988. Moreover, plaintiff attempted to return to work in September 1988 after she recovered from her surgery, failing only because the company had closed.

The only medical evidence accumulated during the relevant period supports the Commissioner's conclusion. The report from Sloan-Kettering showed that plaintiff fully recovered

---

[4]Plaintiff claims her job as a bookkeeper is sheltered employment and thus not past relevant work. However, the Commissioner's requirements for substantial gainful activity, 20 C.F.R. § 404.1574(b)(2) (2006) (earnings of at least $300 a month between 1980 and 1989 constitute substantial gainful activity), and plaintiff's earnings records show that the Commissioner's decision was based on substantial evidence. Moreover, plaintiff's reliance on SSR 02-1p ¶ 8, which states "our RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting... 8 hours a day, for 5 days a week" is misguided, since the footnote to that very sentence states that "the ability to work 8 hours a day, for 5 days a week is not always required for a finding at step 4 of the sequential evaluation process for adults when an individual can do past relevant work that was part-time work, if that work was substantial gainful activity, performed within the applicable period, and lasted long enough for the person to learn to do it." 67 Fed.Reg. at 57862-57863 n. 5 (citing 1996 WL 374184 at *8 n. 2).

from adenocarcinoma without recurrence. The examining physician indicated that plaintiff could independently climb one and a half flights of stairs, stand, walk, cook, and eat, although she needed help shopping. Additionally, plaintiff's hypertension and anxiety appeared to be under good control. Finally, the treating physician found no edema in the extremities. Ultimately, there is no indication from the findings of Sloan-Kettering that, at that time, plaintiff could not perform her past work.

After her surgery in 1988, the record contains no medical evidence for the remainder of the relevant period, although plaintiff maintains that she saw Dr. Herkus for "mental medical treatment" from 1988-1992. Accepting her testimony, the only treatment she received from Dr. Herkus was the same Ativan which the medical records indicated was sufficient to control her anxiety. Plaintiff then sought no medical treatment at all from 1993 to 1995. In *Arnone v. Bowen*, 882 F.2d 34, 39 (2d Cir. 1989), the Second Circuit found that "failure to present any medical evidence from [the relevant] period seriously undermines [plaintiff's] contention that he was continuously disabled during that time." The same reasoning applies here.

In support of her argument for reversal, plaintiff cites Dr. DeRosa's opinion and her own testimony and affidavit as evidence she could not perform her past work. While the Commissioner considered Dr. DeRosa's determinations, the Commissioner properly discounted Dr. DeRosa's medical assessments because he did not begin treating plaintiff until 1995, and his opinions were based on her condition on the day she last visited him, June 15, 2003. Here, as in *Arnone*, the treating physician rule does not bind the Commissioner because there was not an "on-going physician-treatment relationship" during the relevant period. 882 F.2d 34 at 41. *See also Perez v. Chater* 77 F.3d at 47.

The Commissioner also properly treated plaintiff's own testimony and affidavit. In

17

determining whether a claimant is disabled, the Commissioner must consider "subjective evidence of pain and disability testified to by the claimant." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999). However, the Commissioner is entitled to evaluate the credibility of a claimant in light of medical findings and other evidence and come to an independent judgment regarding the true extent of the pain alleged by the claimant. *Dumas v. Schweiker*, 712 F.2d 1545, 1552-53 (2d Cir. 1983).

Although plaintiff is entitled to "substantial credibility" given her long work history, *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983), the Commissioner discounted plaintiff's testimony and affidavit to the extent that they were inconsistent with medical evidence, the lack of medical treatment, and her own activities during the relevant period. This conclusion was based on substantial evidence. For example, plaintiff's statements in her 2005 affidavit that she could not take public transportation because she could not climb the steps to take a bus or the subway and she feared going out in public alone contradict the pre-operative report from Sloan Kettering, which described plaintiff as being capable of walking one and a half flights of stairs and her anxiety as being fairly controlled on Ativan. Moreover, her statement that she was unable to work after her hospitalization directly contradicts her own actions, specifically her attempt to return to work in September 1988. As a result, the Commissioner was not in error in considering but ultimately rejecting plaintiff's complaints and allegations of limitations.

In sum, there is substantial evidence supporting the Commissioner's conclusion that plaintiff could perform her past work since "a reasonable mind might accept [the evidence] as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. at 401. Although a reasonable mind could very well conclude that plaintiff was disabled prior to December 31, 1992, if substantial evidence exists in support of the Commissioner's decision, the court must uphold the decision. *Perez v.*

*Chater*, 77 F.3d at 46. Therefore, the Commissioner's decision is upheld.

## VI. CONCLUSION

The defendant's motion for judgment on the pleadings is granted and the Clerk of Court is directed to enter judgment for defendant.

**SO ORDERED.**

 **/s/ *Nina Gershon*** 
**Nina Gershon, U.S.D.J.**

Dated: Brooklyn, NY
 June 27, 2007